**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CHARLES GORMLY**,<br><br>Plaintiff,<br><br>v.<br><br>**JAMES WALKER, *et al.***,<br><br>Defendants. | Case Nos. 21-cv-2688 (CRC)<br>21-cv-2693 (CRC) |
| **HELEN A. KASAY**,<br><br>Plaintiff,<br><br>v.<br><br>**DISTRICT OF COLUMBIA, *et al.***,<br><br>Defendants. | |

**MEMORANDUM OPINION**

These consolidated cases arise out of a fire that tore through an illegally subdivided row house, killing two residents: nine-year-old Yafet Solomon and 40-year-old Fitsum Kebede. After their deaths, Solomon and Kebede's personal representatives each filed suit in District of Columbia Superior Court against their landlord, the District of Columbia, and several District employees who allegedly ignored or mishandled complaints about conditions at the row house.

Each suit raises, among others, a claim against the District under 42 U.S.C. § 1983. The plaintiffs contend that the District violated the victims' due process rights through unlawful customs, policies, or practices that diminished any possibility of remediating the hazards that led to the deadly fire. They rely on allegations, substantiated by an independent consultant's report, that a police officer had repeatedly notified the District of hazardous conditions at the house, but

that those responsible for inspecting residential buildings either overlooked or failed to adequately respond to those reports.

The District removed both cases to this Court, where they were consolidated for administrative purposes.[1] The District now seeks to dismiss all the claims against it and its employees, including the § 1983 claim. The property's landlord also moves to dismiss.

The facts of this case are both troubling and tragic. The plaintiffs' complaints catalogue a series of missed opportunities to address the dangerous conditions at the row house where Solomon and Kebede lived—opportunities missed apparently due to well-documented incompetence and misfeasance by District employees. But the question before the Court now is a narrow one: Do those allegations of fact state a claim for a violation of the victims' substantive due process rights? The Court concludes they do not, so the pending § 1983 claim in each case must be dismissed. And because the remaining claims do not trigger this Court's original jurisdiction, the Court will remand them to the Superior Court for consideration in that forum.

## I. Background

### A. Factual Background

Before their deaths in the August 2019 fire, Yafet Solomon and Fitsum Kebede lived at 708 Kennedy Street, NW.[2] Compls. ¶ 25. The property's owner, defendant James Walker, had subdivided the house into several units, using drywall partitions to separate the spaces and a

---

[1] The Court refers to the District and the individual District employee defendants, collectively, as "the District."

[2] The Court draws the following facts from the allegations in the plaintiffs' complaints, which the Court must accept as true at the motion to dismiss stage. See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). Because many paragraphs in the two complaints contain nearly identical factual allegations, the Court cites to the two documents collectively where possible.

series of extension cords to run electricity to each makeshift room. Compls. ¶¶ 24, 28–30. Two of those units were small, windowless rooms in the basement. Compls. ¶ 31. Nine-year-old Solomon lived in one basement room with his mother, plaintiff Helen Kasay. Kasay Compl. ¶ 31. Kebede lived in the other. Gormly Compl. ¶ 31. To separate those basement units from the first floor of the house—which was used as a seamstress shop—Walker installed a metal security gate on the interior door. Compls. ¶¶ 27, 33. As a result, the only exit from the basement was through a door to the rear of the property. Compls. ¶ 34. Walker did not have valid occupancy certificates to use 708 Kennedy as either a residential rental property or a seamstress shop. Compls. ¶ 38.

At the time of the fire, the District had been notified of problems at 708 Kennedy, but it had done little to respond to repeated complaints about the hazardous conditions the residents faced. Months earlier, on March 21, 2019, Metropolitan Police Department ("MPD") Officer Ernie Davis identified several code violations at 708 Kennedy when investigating a noise complaint. Compls. ¶¶ 41–44. Among other things, Officer Davis noticed "too many make shift doors with locks[,] which would make it difficult to exit in an emergency." Compls. ¶ 47 (quoting Public Incident Report). The next day, Officer Davis emailed a report of the violations at 708 Kennedy to four employees in the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA"), and two with Fire and Emergency Services ("FEMS"). Compls. ¶ 50. Officer Davis "strongly recommend[ed]" that both DCRA and Fire Department code inspectors respond to the listed location. Compls. ¶ 49.

But District employees did not act on this report or otherwise respond to Officer Davis's concerns. Rather, as a District-commissioned independent investigation later documented, the employees failed to follow standard communications protocols, ultimately leading to a "failure to

properly report, respond to, and address the . . . unsafe conditions reported at 708 Kennedy." Kasay Compl. Ex. 1 ("A&M Report") at 31–34; Compls. ¶¶ 53–68. Officer Davis followed up a month later. In April, he emailed a Program Analyst at DCRA asking that an investigator check whether 708 Kennedy was complying with applicable zoning regulations and had a proper certificate of occupancy. Compls. ¶ 71. Once again, DCRA did not assign an investigator or open a complaint in response to MPD's concerns about the property. See Compls. ¶¶ 71–74.

It was only after Officer Davis followed up another time, on May 21, 2019, that DCRA assigned an investigator to 708 Kennedy. Compls. ¶¶ 73–77. But the individual assigned, defendant Steven Allen, was not trained to recognize code violations, and had only been tasked with checking on the occupancy permits at the property. Compls. ¶ 78. As a result, when Allen visited 708 Kennedy over the next several days, he simply took photographs of the front of the building and left his business card at the front door. Compls. ¶¶ 82–86. He never entered the property to search for hazardous conditions nor sought an administrative search warrant that would allow him to do so, despite a decade and a half of documented complaints about safety issues at 708 Kennedy in the Department's records system. Compls. ¶¶ 88–89, 92. An independent investigation later found that Allen failed to follow DCRA "best practices," and that this failure stemmed at least in part from the department's understaffing and the lack of training required of its small team of investigators. See A&M Report at 35, 45–46. In July, DCRA investigators decided to suspend the investigation into 708 Kennedy, Compls. ¶ 97, and on August 16, the investigation was officially closed. Compls. ¶ 100.

Two days later, a fire broke out in the property's basement. Gormly Compl. ¶ 102; Kasay Compl. ¶ 104. Earlier that morning, plaintiff Helen Kasay had departed for work, leaving her son in Kebede's care. Kasay Compl. ¶¶ 102–03. At some point before 9:36 a.m., a fire

started near the rear of the basement. Gormly Compl. ¶ 102; Kasay Compl. ¶¶ 104–05. It soon cut off the only unblocked exit and trapped the two inside. Gormly Compl. ¶ 103; Kasay Compl. ¶ 106. When the fire department arrived, firefighters could only access the basement by sawing through the metal bars blocking the interior door. Gormly Compl. ¶¶ 106–07; Kasay Compl. ¶¶ 109–10. Once downstairs, they found Solomon and Kebede, who had lost consciousness while attempting to escape the fire. Gormly Compl. ¶ 108; Kasay Compl. ¶¶ 111–12. Although both were transported to the hospital to receive care, Kebede died that same day. Gormly Compl. ¶¶ 111–12; Kasay Compl. ¶ 115. Two days later, Solomon was declared brain dead and removed from life support. Kasay Compl. ¶¶ 133, 139.

In the aftermath of the fire, the District commissioned an independent report on the handling of the complaints about 708 Kennedy by MPD, DCRA, and FEMS. See A&M Report at 2. That report identified several "critical violations" of District policies that, "if handled differently, could have impacted the likelihood of the 708 Kennedy Fire." See id. at 30. The report offered several recommendations for improving MPD, DCRA, and FEMS policies and procedures going forward. See id. at 50–69.

B. Procedural History

In August 2021, the plaintiffs each filed suit in District of Columbia Superior Court—Charles Gormly as representative of Fitsum Kebede's estate, and Helen Kasay on behalf of the estate of her son, Yafet Solomon.[3] See Compls. ¶ 2. Their complaints raise five claims. These

[3] The two complaints are largely similar. Kasay's offers additional details about her son's injuries and attaches the independent investigator's report as an exhibit. See Kasay Compl. ¶¶ 115–139; A&M Report. Gormly's includes additional allegations in the negligence claims against Walker. See Gormly Compl. ¶¶ 192, 206. Because they are identical in all relevant respects, the Court treats the two complaints together in this opinion.

include two state-law negligence claims against Walker, and two more against the District and various District employees involved in the alleged mishandling of the hazardous-conditions reports. See Gormly Compl. ¶¶ 186–247; Kasay Compl. ¶¶ 213–72. Both complaints also bring a claim against the District under 42 U.S.C. § 1983. See Gormly Compl. ¶¶ 248–56; Kasay Compl. ¶¶ 273–81. With their § 1983 claims, the plaintiffs allege that the District maintained customs, policies, or practices that unconstitutionally "created and/or amplified the risk to occupants of dangerous . . . rental properties," ultimately depriving Kebede and Solomon of their rights to "life, safety, and personal security" protected by the Fifth Amendment.[4] Gormly Compl. ¶ 254; Kasay Compl. ¶ 279.

The District removed both cases to federal court, invoking this Court's federal question jurisdiction based on the two § 1983 claims. See Notice of Removal at 3, Gormly v. Walker, No. 21-cv-2688, Oct. 13, 2021; Notice of Removal at 3, Kasay v. District of Columbia, No. 21-cv-2693, Oct. 14, 2021. The Court consolidated the two cases for docketing purposes. See Order, Gormly v. Walker, No. 21-cv-2688, Dec. 14, 2021, ECF No. 11. The District filed a motion to dismiss the claims against both it and its employees in the consolidated cases.[5] The victims' landlord, Walker, has likewise moved to dismiss. Those motions are now ready for review.

---

[4] The complaints also allege that the District violated the fire victims' due process rights under the Fourteenth Amendment. But the District is not a state, so due process claims against it are evaluated only under the Fifth Amendment. See Butera v. District of Columbia, 235 F.3d 637, 645 n.7 (D.C. Cir. 2001).

[5] Defendant Steven Allen was served after the other District defendants filed their motion to dismiss. See Aff. of Service, Feb. 10, 2022, ECF No. 27; Proof of Service, Feb. 9, 2022, ECF No. 25. He later joined in the substance of that motion. See Mem. in Supp. of Def. Allen's Mot. Dismiss at 1–2.

## II. Legal Standards

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that fails "to state a claim upon which relief can be granted." When evaluating a 12(b)(6) motion, the court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court "must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up). Although a complaint need not provide "detailed factual allegations" to withstand a 12(b)(6) motion, it must offer "more than labels and conclusions." Twombly, 550 U.S. at 555.

## III. Analysis

### A. Due Process Claims Against the District

The Court begins with the § 1983 claims against the District of Columbia. Both plaintiffs seek to hold the District liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), for creating a municipal custom, policy, or practice that deprived the victims of their constitutional right to due process. To state a Monell claim under § 1983, a plaintiff must allege (1) "a violation of his rights under the Constitution or federal law"; and (2) "that the municipality's custom or policy caused the violation." Warren v. District of Columbia, 353 F.3d 36, 38 (D.C. Cir. 2004). The District argues both that the complaints do not properly state a predicate constitutional violation, and that they have not sufficiently alleged that the District was the "moving force" behind such a violation, if any exists. See Mem. in Supp. of District's Mot.

Dismiss ("District MTD") at 5–13. The Court agrees that the plaintiffs have not stated a viable constitutional claim, so it will dismiss Count V of each complaint on this ground alone.

In their § 1983 claims, the plaintiffs assert that "the District foreseeably created and/or amplified the risk to occupants of" hazardous rental properties, "evincing its deliberate indifference" to Solomon and Kebede's "rights to life, safety, and personal security." See Gormly Compl. ¶ 254; Kasay Compl. ¶ 279. The parties agree that substantive due process is the relevant constitutional right underlying the plaintiffs' claims. See District MTD at 5; Gormly Opp'n to District's Mot. Dismiss ("Gormly Opp'n") at 10; Kasay Opp'n to District's Mot. Dismiss ("Kasay Opp'n") at 9.

The plaintiffs' substantive due process claims run into an early stumbling block: It is well established that "the Due Process Clause 'generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or protect property interests of which the government itself may not deprive the individual.'" Butera v. District of Columbia, 235 F.3d 637, 647 (D.C. Cir. 2001) (quoting DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989)). Thus, in DeShaney, the Supreme Court held that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. at 197.

The plaintiffs' claims would seem to be classic requests for affirmative state protection against private harm. They ask the Court to fault the District for, among other things, failing to train DCRA employees to properly handle code violations, maintaining a reporting system that made it difficult to respond to urgent safety concerns, and relying only on public reporting to identify dangerous rental units. See Gormly Compl. ¶ 251; Kasay Compl. ¶ 276. At heart, the

plaintiffs complain that the District did not come to the aid of Solomon and Kebede as they suffered at the negligent hands of their landlord. DeShaney directly applies.

The plaintiffs resist this straightforward analysis. They say that DeShaney does not govern because their claims "are not based on an invasion by a 'private actor,'" but rather focus on "the actions and inactions of the District Defendants themselves." Gormly Opp'n at 12; see also Kasay Opp'n at 9 (arguing that District "fail[ed] to consider the affirmative actions it took which caused" a deprivation of "life, liberty or property"). The Court is not convinced by this reframing of the complaints' allegations. Crucially, the plaintiffs do not allege that the District caused the fire or made it more difficult for the victims to escape—by, for instance, installing faulty wiring, putting up makeshift partitions, or blocking access to the front exit of the basement. Those were the documented acts of a private individual—Walker—and it was *his* acts that seemingly more directly caused Solomon and Kebede's untimely deaths.[6] See A&M Report at 8; Peter Hermann, Dangerous Conditions Contributed to Deaths of Two Inside Rowhouse That Burned, Court Documents Say, Wash. Post (Aug. 30, 2019, 7:04 PM), https://www.washingtonpost.com/local/public-safety/dangerous-conditions-contributed-to-deaths-of-two-inside-rowhouse-that-burned-court-documents-say/2019/08/30/9362eda4-cb48-11e9-a1fe-ca46e8d573c0_story.html. The complained action and inaction on the District's part all go to its inability to mitigate the risks Walker apparently created—in other words, its "failure to protect [Solomon and Kebede] against private violence." DeShaney, 489 U.S. at 197.

---

[6] In connection with the fire, Walker has been criminally charged with involuntary manslaughter, murder, and violations of various D.C. housing codes. See Docket, District of Columbia v. Walker, 2020-CDC-679 (D.C. Super. Ct. filed Jan. 15, 2020); Docket, United States v. Walker, 2020-CF1-603 (D.C. Super. Ct. filed Jan. 13, 2020). He has pled not guilty, and those cases remain pending in D.C. Superior Court.

That is not the end of the road, however, as the Supreme Court has recognized that, in "certain limited circumstances[,] the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." Id. at 198. The D.C. Circuit has recognized two such circumstances. See Pollard v. District of Columbia, 191 F. Supp. 3d 58, 80 (D.D.C. 2016). First is the custody exception, which imposes a higher duty of care when the state holds an individual in some form of involuntary custody. See DeShaney, 489 U.S. at 199–200. The plaintiffs do not contend that this exception applies.

Second is the state-endangerment exception, under which "an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately results in the individual's harm." Butera, 235 F.3d at 651. To trigger the state-endangerment exception, the District's conduct must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Id. (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)). "This stringent requirement exists to differentiate substantive due process, which is intended only to protect against arbitrary government action, from local tort law." Id. "Conscience-shocking conduct that violates due process usually takes the form of affirmative state action." Est. of Phillips v. District of Columbia, 455 F.3d 397, 403 (D.C. Cir. 2006). For government *inaction* to qualify as conscience shocking, a plaintiff must show (1) that government inaction constituted deliberate indifference; and (2) that the State had some sort of "'heightened obligation toward the individual.'" Fraternal Ord. of Police Dep't of Corr. Lab. Comm. v. Williams ("FOP"), 375 F.3d 1141, 1146 (D.C. Cir. 2004) ) (quoting Butera, 235 F.3d at 651); see also Harvey v. District of Columbia, 798 F.3d 1042, 1050 (D.C. Cir. 2015).

The plaintiffs' allegations do not satisfy the requirements of the state-endangerment doctrine. The parties spend much of their briefing debating whether the complaints here are understood properly as alleging affirmative state action or deliberately indifferent state inaction. Compare District MTD at 7 (calling "the District's alleged failure to act" the "essence of Plaintiffs' claim") with Kasay Opp'n at 9 (contending that District "ignores its active role in foreclosing on the prospect of the dangerous conditions at 708 Kennedy being addressed"); Gormly Opp'n at 13 (same). The Court does not find this distinction particularly illuminating, as at least some of the plaintiffs' allegations could easily be framed as either action or inaction. For instance, the plaintiffs each contend that the District violated the victims' due process rights by closing the investigation into 708 Kennedy without ever inspecting the interior of the property. See Gormly Opp'n at 13; Kasay Opp'n at 10. Is this affirmative government action, based on the District's decision to close the file? Or is it inaction, based on the District's failure to keep the case open or investigate further? The Court need not wade into this debate because the allegations here cannot support a claim for conscience-shocking conduct, however viewed.

If, as the plaintiffs insist, their complaints can be read to allege affirmative conduct on the District's part, they do not state a due process claim because none of the alleged actions actually "increase[d] or create[d] the danger that result[ed] in harm." Butera, 235 F.3d at 650. As previously noted, the plaintiffs focus most on DCRA's decision to close the investigation into 708 Kennedy just days before the fire. See Gormly Opp'n at 13; Kasay Opp'n at 10. In addition, Kasay faults the District for "affirmatively decid[ing] to ignore Officer Davis' credible report without ever inspecting the Property." Kasay Opp'n at 12. According to the plaintiffs, these actions by the District "effectively *foreclosed* the possibility of the dangerous conditions at the Property ever being remediated." Gormly Opp'n at 13; Kasay Opp'n at 10.

To begin, the Court doubts this is strictly true. Although closing the file cut off the path Officer Davis had opened for investigating and addressing the hazardous conditions at 708 Kennedy, it did not necessarily foreclose future remedial action.

But turning to the core of the issue, the government's alleged actions here do not satisfy the law governing conscience-shocking affirmative conduct, in this Circuit or elsewhere. In Butera, the D.C. Circuit explained that, to meet this standard, the plaintiffs must allege that state officials have "affirmatively act[ed] to increase or create the danger that ultimately result[ed] in the individual's harm." 235 F.3d at 651. Thus, in that case, the court credited allegations that the District had recruited and sent an operative into a dangerous undercover drug buy without adequate measures to ensure his safety. See id. at 652. Other circuits, too, have only found the exception triggered where state actors had some "hand in creating a danger." Reed v. Gardner, 986 F.2d 1122, 1125 (7th Cir. 1993). The Seventh Circuit, for example, held that victims of a car accident stated a substantive due process claim where police arrested a presumably sober driver and left the car keys behind with a knowingly drunk passenger. Id. at 1127. As that court reasoned, "[b]y removing a safe driver from the road and not taking steps to prevent a dangerous driver from taking the wheel, the defendants arguably changed a safe situation into a dangerous one." Id. The Third Circuit likewise applied the exception to a firearms instructor who, during a routine training, shot another state trooper at close range after failing to conduct a standard and obvious check to ensure the gun was unloaded. Kedra v. Schroeter, 876 F.3d 424, 443–44, 448 (3d Cir. 2017). Once again, "liability under the state-created danger doctrine" existed only because the plaintiff had alleged "conscience-shocking, affirmative behavior from a state official that caused foreseeable and fairly direct harm to a person who was a foreseeable victim of that behavior." Id. at 448 n.18 (internal quotation marks omitted).

As the Court has already explained, the plaintiffs' allegations do not suggest that the District or its employees had a hand in creating the danger that led to Solomon and Kebede's deaths, or turned a safe situation into a dangerous one. Rather, the affirmative acts at issue—sending in a poorly trained inspector or closing a case file—only concern the District's failed efforts to remediate pre-existing hazards. While better DCRA inspection policies "may have conceivably saved" Solomon and Kebede's lives, the District's "actions did not increase or create the danger" posed by the hazardous conditions at 708 Kennedy. Wright v. District of Columbia, 799 F. Supp. 2d 1, 8 (D.D.C. 2011); see also id. (rejecting claim that decision to cease life-giving care to gunshot victim satisfied state-endangerment doctrine because "[w]hoever shot him[,]" not the government, "create[d] the danger that ultimately resulted in [his] demise"). The conduct alleged here therefore does not fall within the state-endangerment exception.

The plaintiffs—particularly Gormly—invite the Court to consider the allegations as evidence, too, of the District's deliberate indifference to the victims' constitutional rights. See Gormly Opp'n at 13–19. Even when framed as allegedly unconstitutional inaction, the plaintiffs' allegations fail. Deliberate indifference—as opposed to intentional conduct—satisfies the "shock the conscience test . . . only in 'circumstances where the State has a heightened obligation toward the individual.'"[7] FOP, 375 F.3d at 1145–46 (quoting Butera, 235 F.3d at 651).

---

[7] The plaintiffs spend much of their briefing discussing whether some differently framed lower standard—like gross negligence or recklessness—may also satisfy the shock-the-conscience test. See Gormly Opp'n at 16; Kasay Opp'n at 11. They draw this standard from the Supreme Court's observation that it was a "closer call[]" whether "something more than negligence but less than intentional conduct, such as recklessness or gross negligence" may reach "the point of the conscience shocking." Lewis, 523 U.S. at 849 (internal quotation marks omitted). But in Lewis, the Supreme Court expressly linked this discussion to its deliberate

There is no heightened obligation here. Neither plaintiff argues that the District had any special relationship with the residents of 708 Kennedy. Nor do the circumstances in this case resemble those where the D.C. Circuit has found one. Under prevailing D.C. Circuit law, such a "special relationship" exists only where the District has deprived the victims of liberty in some substantial way. Est. of Phillips, 455 F.3d at 405–06. For instance, the court has found a heightened obligation where the District had legal custody over those participating in a "program for delinquent youths," see Smith v. District of Columbia, 413 F.3d 86, 90, 94 (D.C. Cir. 2005), or had involuntarily committed a person with disabilities to its care, Harvey, 798 F.3d at 1051. As the Supreme Court has explained, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." DeShaney, 489 U.S. at 200. Here, the District had not taken Solomon or Kebede into custody, nor restrained them in any way that would prevent them (or, in Solomon's case, his mother) from working to remedy the hazardous conditions on their own—by, for example, separately reporting the violations to the District, or moving to safer housing. The plaintiffs therefore are not entitled to state a substantive due process claim through allegations of deliberate indifference alone.

---

indifference jurisprudence. Id. at 850. The Court did not indicate how those standards would differ or whether it endorsed one over the other.

More to the point, the Court in Lewis recognized that it would only be appropriate to apply any lower standard for conscience-shocking conduct in certain circumstances, such as "the custodial situation of a prison." Id. at 851. Indeed, the D.C. Circuit cited this passage in Lewis as a source of its heightened-obligation requirement. See FOP, 375 F.3d at 1145–46. Thus, however the government's inaction is framed—whether recklessness, gross negligence, or deliberate indifference—the plaintiffs still must identify some heightened obligation to take advantage of this doctrine.

In reaching this legal conclusion, the Court does not mean to minimize the many practical barriers that residents like Kebede, Solomon's family, and others in their circumstances face in reporting unsafe conditions, negotiating with landlords, and finding safe and affordable housing in the District. Those very obstacles are likely why, as the plaintiffs point out, District law imposes on the city's government an obligation to investigate and remediate hazardous housing conditions. See, e.g., D.C. Code § 6-801(a) (mandating that "Mayor shall examine" any structure that "is reported to the District government as unsafe"); D.C. Mun. Regs. tit. 12A § 115.1 (requiring that "[a]ll premises" that become "unsafe," or "which constitute a fire hazard, or are otherwise dangerous to human life or the public welfare . . . be deemed an unsafe condition," and "be removed or made safe and secure, as the code official deems necessary"). The plaintiffs have numerous avenues to pursue claims against the District for failing to meet those obligations. But the District's failure here simply does not rise to the level of a federal constitutional violation. Cf. Collins v. City of Harker Heights, 503 U.S. 115, 117 (1992) (holding that city's conduct did not violate the Due Process Clause "[e]ven though [it] may be actionable under state law"). For that reason, the plaintiffs' § 1983 claims must be dismissed for failure to state a predicate constitutional violation.

B. Remaining Claims

Now that the Court has dismissed the § 1983 claims, only state-law claims remain in each complaint: two negligence-based claims against the District and its employees, and two negligence-based claims against Walker. See Gormly Compl. ¶¶ 186–247; Kasay Compl. ¶¶ 213–72. The Court declines to exercise supplemental jurisdiction over these state-law claims.

The Court has an "obligation to employ its discretion to determine whether to exercise supplemental jurisdiction over . . . ancillary state-law claims." Araya v. JPMorgan Chase Bank,

N.A., 775 F.3d 409, 414 (D.C. Cir. 2014). Several factors govern that decision, "including the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims." Id. In particular, a district court may decline supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction." 28 US.C. § 1367(c)(3). As the D.C. Circuit has explained, where all federal claims "are dismissed before trial," declining to exercise jurisdiction is generally "in keeping with the principle that needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties." Araya, 775 F.3d at 417 (cleaned up).

Those principles counsel in favor of remand here. The Court has now dismissed the only claims invoking federal jurisdiction at an early juncture—well before trial, and even before discovery. Nevertheless arguing against remand, the District counters that maintaining jurisdiction would "promote[] judicial efficiency," given the legal and factual links between the plaintiffs' constitutional and negligence claims. Reply in Supp. of District's Mot. Dismiss ("District Reply") at 9. The Court disagrees. Contrary to the District's suggestion, the plaintiffs' state-law claims may "require resolving unsettled issues of District of Columbia law." Id. (quoting Sheikh v. District of Columbia, 77 F. Supp. 3d 73, 91 (D.D.C. 2015)). Most notably, in defending their negligence claims against the District, both plaintiffs ask the Court to "expand" an exception to the D.C. public-duty doctrine, if that doctrine would otherwise bar their claims. See Kasay Opp'n at 22–25; Gormly Opp'n at 32–35. Even the District acknowledges that this is a question most appropriately presented to the District's courts: In arguing against the expanded exception, it contends that granting the plaintiffs' request is "beyond the powers of this federal

court." District Reply at 12. That may be true. But that is a reason to remand the issue—not to reject the plaintiffs' argument on the merits.

Because at least some of the plaintiffs' claims may "present[] unsettled issues of state law[,]" Araya, 775 F.3d 409 at 417, and because all federal claims have been dismissed, the Court will decline jurisdiction over the remaining claims. Accordingly, the Court does not reach the merits of the defendants' remaining arguments for dismissal, nor Kasay's pending motion for sanctions against Walker.

## IV. Conclusion

For the foregoing reasons, the Court will grant in part the District of Columbia's Motion to Dismiss. The Court will dismiss Count V of each complaint—the plaintiffs' § 1983 claims. The Court does not weigh in on any other issue in the District's or Walker's motions to dismiss, and instead denies the remainder of the pending motions without prejudice. The remaining claims will be remanded to the Superior Court of the District of Columbia for further proceedings consistent with this opinion. A separate Order will accompany this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: June 6, 2022